United States District Court
Middle District of Florida
Tampa Division

**VICTORIA LANGER, ON BEHALF OF**
**JEANNETTE MARIE LANGER,**

> *Plaintiff,*

V.                                                         **NO. 8:19-CV-1273-T-24PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

> *Defendant.*

---

# Report & Recommendation

Victoria Langer brings this action under 42 U.S.C. § 405(g) on behalf of her late daughter, Jeannette Marie Langer.

Victoria requests reversal of a final decision of the Commissioner of Social Security denying Jeannette's applications for benefits for an award of benefits and an award of benefits or remand for additional administrative proceedings. Doc. 21. The Commissioner requests affirmance. Doc. 21.

The final decision is a decision by an Administrative Law Judge ("ALJ") entered on July 19, 2018. Tr. 12–32. The ALJ followed the five-step process used by the Social Security Administration to determine whether an applicant is disabled.[1]

---

[1]Under the five-step process, the Social Security Administration asks (1) whether the claimant is engaged in substantial gainful activity, (2) whether she has a severe impairment or combination of impairments, (3) whether the impairment or combination of impairments meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) whether she can perform any of her past relevant work given her residual functional capacity ("RFC"), and (5) whether there are a significant number of jobs in the national economy she can perform given her RFC, age,

Victoria argues: the ALJ erred in considering Jeannette's visual impairment and failing to consider a medical opinion about the impairment, substantial evidence does not support the ALJ's job numbers, the ALJ erred by failing to resolve an asserted inconsistency in the evidence, and the ALJ erred by failing to account for Jeannette's moderate limitation in concentrating, persisting, or maintaining pace. Doc. 15 at 7–25.

The Commissioner argues the ALJ committed no or harmless error and substantial evidence supports the ALJ's findings. Doc. 21 at 5–24.

## I.    Background

Jeannette was born in 1970. Tr. 52. She completed two years of college and worked as an office manager at a repair and towing shop. Tr. 323. She last worked in August 2014.[2] Tr. 322. She was insured through 2019.[3] Tr. 52.

Jeannette applied for a period of disability and disability insurance benefits in October 2015 and for supplemental security income in November 2015. Tr. 278–289. She alleged she had become disabled in August 2014 from anxiety, depression, and vision problems, including cataracts and an inability to read or drive. Tr. 52. She stated her vision was 20/60 in December 2014 and had worsened. Tr. 52.

Jeannette died after denials at the initial and reconsideration levels of administrative review.[4] Tr. 52–77, 82–109. Victoria pursued the applications on

---

education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[2]Part of a disability report erroneously states Jeannette stopped working in August 2015. Tr. 323. She stated she stopped work in August 2014 (the alleged disability onset date) and her last earnings were from August, Tr. 297.

[3]The initial disability determination states the date last insured. Tr. 52. The date last insured is not in the earnings record. *See* Tr. 290–97. The precise date is immaterial to the decision here.

[4]The Certification of Death states Jeannette's cause of death was multi-system organ failure and sepsis. Tr. 594. Victoria testified doctors had not told her what "actually

Jeannette's behalf, ultimately bringing this action after failing at the remaining levels of administrative review.[5] Tr. 1–6, 12–32.

## II.    ALJ's Decision

The ALJ conducted a hearing in May 2018, at which Victoria was represented by a lawyer and Victoria and the vocational expert ("VE") testified. Tr. 33–51.

At step one, the ALJ found Jeannette had not engaged in substantial gainful activity after August 2014. Tr. 17.

At step two, the ALJ found Jeannette had suffered from severe impairments of anxiety disorder, major depressive disorder, substance addiction disorder (alcohol), drug abuse (cocaine), and post-fracture of the fifth metatarsal. Tr. 17. He found her hypertension non-severe. Tr. 18. He mentioned no visual impairment.

---

happened" but that her daughter had been "without air," had suffered from a gallbladder problem, had had sepsis, and had been in the hospital for a few days before removal of life support. Tr. 42–43. Neither party suggests the death was related to an impairment described in Jeannette's applications.

[5]Victoria signed a "Notice Regarding Substitution of Party Upon Death of Claimant." Tr. 268. The form states, "I have been informed that the claimant had requested a hearing but died before action on the request was completed. I understand that the deceased claimant's request for hearing will have to be dismissed unless an eligible person is substituted. My relationship to the deceased claimant is:[.]" Tr. 268. In a checklist underneath, Victoria marked "Parent." Tr. 268.

The Hearings, Appeals, and Litigation Law Manual ("HALLEX"), which provides guidance for processing and adjudicating claims during the administrative proceedings, instructs an ALJ on whether to proceed with a hearing if a claimant has requested a hearing but dies before the hearing is conducted. HALLEX I-2-4-35. The HALLEX directs that the ALJ will not dismiss the hearing request for disability claims (under Title II) if there is a substitute party under 20 C.F.R. § 404.503(b), or for supplemental security income (Under Title XVI), an eligible survivor for benefits under 20 C.F.R. § 416.542(b).

While a parent can be a substitute party under § 404.503(b), a parent is not an eligible survivor for benefits under § 416.542(b). Victoria can pursue Jeannette's claim for disability benefits.

The ALJ considered the "paragraph B" criteria.[6] Tr. 18–19.

For the first functional area, the ALJ explained:

In understanding, remembering, or applying information, the claimant had a moderate limitation. In a function report, the claimant provided relevant and coherent responses to questions. Moreover, she indicated that she was able to follow spoken instructions "fine." When Dr. Maria Jimenez conducted a mental consultative examination of the claimant on December 29, 2014, she found that the claimant's "immediate memory appeared to be adequate" and her "recent memory appeared to be moderately impaired[.]" She also noted that the claimant's mental flexibility appeared to be "fair," and she demonstrated "good mental computation." During this examination, she noted that **the claimant smelled of alcohol**; and she **reported drinking about a "12 pack of beer per day every day for the past 7 years[.]"** Mental health treatment notes describe her cognitive functioning as "average[.]" In a thorough review of the record, the undersigned found no diagnoses of a learning disorder or a significant intellectual deficit. Indeed, the claimant completed high school and worked for a number of years in jobs that the vocational expert classified as skilled and semi-skilled[.] Based on hearing testimony and a review of the record, the undersigned finds that the claimant had no more than a moderate limitation in the functional area of understanding, remembering, or applying information. To accommodate this moderate degree of limitation, the undersigned finds that the claimant was limited to performing routine and repetitive tasks.

Tr. 18 (internal citations omitted) (emphasis in original).

For the second functional area, the ALJ explained:

---

[6]The "paragraph B" criteria are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C). To satisfy the "paragraph B" criteria, the mental impairment must result in "an 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning": (1) ability to understand, remember, or apply information; (2) ability to interact with others; (3) ability to concentrate, persist, or maintain pace; and (4) ability to adapt or manage oneself. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A)(2)(b). The limitations found when assessing the "paragraph B" criteria are not an RFC assessment. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (July 2, 1996).

In interacting with others, the claimant had a moderate limitation. At the hearing, the claimant's mother said that the claimant maintained a relationship with a boyfriend. She did not describe the claimant as having any major problems interacting with others. In a function report, the claimant indicated that she was able to get along "fine" with authority figures; and she never lost any jobs due to problems getting along with other people. When Dr. Maria Jimenez conducted a mental consultative examination of the claimant on December 29, 2014, she found that the claimant "displayed fair social skills" and maintained "adequate eye contact" and a "positive attitude." During this examination, she noted that the claimant smelled of alcohol; and she reported drinking about a "12 pack of beer per day every day for the past 7 years." Doctors Lauriann Sandrik and Maurice Rudmann conducted thorough and independent reviews of the record on December 31, 2015, and February 11, 2016, respectively. They both concluded that the claimant had a moderate limitation in the functional area of maintaining social functioning. Based on hearing testimony and a thorough review of the record, the undersigned finds that the claimant had no more than a moderate limitation in the functional area of interacting with others. To accommodate this moderate limitation in the functional area of interacting with others, the undersigned finds that the claimant's contact with co-workers and the general public should have been no more than occasional.

Tr. 18–19.

For the third functional area, the ALJ explained:

With regard to concentrating, persisting, or maintaining pace, the claimant had a moderate limitation. At the hearing, the claimant's mother did not allege that the claimant has any specific difficulties with concentration, persisting, or maintain pace. In a function report, the claimant vaguely alleged that she is able to pay attention for only "a few minutes" at a time. When Dr. Maria Jimenez conducted a mental consultative examination of the claimant on December 29, 2014, the claimant demonstrated "adequate attention and concentration," and "did not display any significant difficulties in processing speed[.]" During this examination, she noted that the claimant smelled of alcohol; and she reported drinking about a "12 pack of beer per day every day for the past 7 years[.]" Doctors Lauriann Sandrik and Maurice Rudmann conducted thorough and independent reviews of the record on December 31, 2015, and February 11, 2016, respectively. They both concluded that the claimant had a moderate limitation in the functional area of maintaining concentration, persistence, or pace. Based on hearing

testimony and a thorough review of the record, the undersigned finds that the claimant had no more than moderate limitation in the functional area of concentrating, persisting, or maintaining pace.

Tr. 19 (internal citations omitted).

For the fourth functional area, the ALJ explained:

As for adapting or managing oneself, the claimant had experienced a moderate limitation. At the hearing, the claimant's mother did not indicate that the claimant had any significant difficulties with adapting or managing herself that she attributed to mental impairments. Instead, she attributed nearly all problems with activities of daily living to symptoms of physical impairments. In a function report, the claimant indicated that she did not handle stress or changes in routine well. When Dr. Maria Jimenez conducted a mental consultative examination of the claimant on December 29, 2014, she found that the claimant "demonstrated good basic grooming and hygiene," but she found that the claimant's mental flexibility appear to be only "fair." Mental health treatment notes described judg[]ment as "appropriate" and her responsiveness as "alert". Doctors Lauriann Sandrik and Maurice Rudmann conducted thorough and independent reviews of the record on December 31, 2015, and February 11, 2016, respectively. They both concluded that the claimant had a mild limitation in the functional area of activities of daily living. Based on hearing testimony and a thorough review of the record, the undersigned finds that the claimant had a moderate limitation in the functional area of adapting or managing herself. To accommodate this moderate degree of limitation, the undersigned finds that the claimant was limited to tolerating no more than gradual changes in work routine.

Tr. 19.

The ALJ also considered the "paragraph C" criteria and found Jeannette had not met them.[7] Tr. 20.

At step three, the ALJ found Jeannette had suffered no impairment or combination of impairments that meets or medically equals the severity of any

---

[7]Paragraph C lists additional functional criteria for some listings. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A).

impairment in the regulatory listings, 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 18.

The ALJ found Jeannette had possessed the residual functional capacity ("RFC")[8] to perform sedentary, light, and medium work with additional limitations:

> [Jeannette was] limited to simple and repetitive tasks; changes in the work routine must have been introduced gradually; contact with the general public and coworkers must have been no more than occasional; reading of printed materials and monitors was frequent, not constant; (due to distractibility) could not climb ladders, scaffolds or ropes, and could not work in unprotected heights.

Tr. 20.

At step four, the ALJ found Jeannette had not been able to perform her past relevant work. Tr. 24.

At step five, based on the VE's testimony from the hearing, the ALJ found Jeannette had been able to perform the unskilled jobs of hand packager, cook helper, advertising material distributor, bench assembler, and hand packager, and those jobs exist in significant numbers in the national economy.[9] Tr. 24–25.

The ALJ therefore found no disability. Tr. 25.

---

[8] A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

[9] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength." 20 C.F.R. §§ 404.1568(a), 416.968(a). The Social Security Administration considers work "unskilled" if "a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." *Id.*

There are two bench assembler jobs, one at the light level and one at the sedentary level. Tr. 25. They are under the same code in the Dictionary of Occupational Titles. Tr. 49. The ALJ's decision mistakenly lists one of the codes with one different digit.

## III.    Standard of Review

A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g); *accord* 42 U.S.C. § 1383(c)(3). Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.*

The substantial-evidence standard applies only to factual findings. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). "The Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoted authority and alterations omitted).

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). If "remand would be an idle and useless formality," a reviewing court need not "convert judicial review of agency action into a ping-pong game." *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).

## IV.    Law & Analysis

## A.    *Visual Impairment*

Victoria argues the ALJ erred by failing to properly consider Jeannette's visual impairment and a medical opinion about them. Doc. 15 at 12–14.

To obtain benefits, a claimant must demonstrate she is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a). A claimant is disabled if she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005).

The Social Security Administration "will evaluate every medical opinion" it receives. 20 C.F.R. §§ 404.1527(c), 416.927(c).[10] A medical opinion is a statement from an acceptable medical source that reflects judgment about the nature and severity of an impairment, including symptoms, diagnosis, prognosis, physical restrictions, mental restrictions, and what someone can do despite the impairment. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a).

An ALJ must state with particularity the weight he gives a medical opinion and the reasons for that weight. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). And the ALJ must state the grounds for his decision with enough clarity to allow a court to conduct a meaningful review. *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984). If an ALJ does not "state with at least some measure of clarity the grounds for his decision," a court will not affirm simply because some rationale might have supported it. *Winschel*, 631 F.3d 1179.

An ALJ must consider all relevant record evidence. 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d

---

[10]"For claims filed … before March 27, 2017, the rules in [20 C.F.R. §§ 404.1527, 416.927] apply. For claims filed on or after March 27, 2017, the rules in [§§ 404.1520c and 416.920(c)] apply." 20 C.F.R. §§ 404.1527, 416.927. Because Jeannette filed her claims for benefits before March 27, 2017, the rules in §§ 404.1527 and 416.927 apply here.

1206, 1211 (11th Cir. 2005) (internal quotation marks omitted). An ALJ's determination may be implicit, but the "implication must be obvious to the reviewing court." *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983).

In October 2014, Jeannette visited the office of Mark W. Matthews, III, O.D. Tr. 504–06, Tr. 536–38. The provider noted she had been referred by another doctor and complained of blurred vision for near and distance vision.[11] Tr. 504. She reported using store-bought reading glasses that failed to help. Tr. 504. A review of systems other than vision was normal. Tr. 504–05. Under "Unaided Acuities," the provider documented a visual acuity of 20/60 in both eyes. Tr. 505. Under "Manifest," the provider documented a visual acuity of 20/60 in the right eye ("OD" or oculus dextrus) with a sphere (prescription power) of +1.50, 20/50 in the left eye ("OS" or oculus sinister) with a sphere of +1.25, and 20/50 in both ("OU" or oculus uterque). Tr. 505.

Based on an eye examination, the provider documented that confrontation-fields observations, Amsler-studies observations, extraocular muscles, eyelashes, eyelids, lacrimal system, pupils, cornea, conjunctiva, sclera, iris, anterior chambers, vitreous, optic nerve, macula, and retina were all normal. Tr. 505–06. Next to "Lens," the provider wrote, "Bilateral: Opacities exist in the posterior subcapsular space, centrally." Tr. 506.

Under "Impressions" and "Diagnosis," the provider wrote, "Bilateral: Posterior subcapsular polar cataract" and hyperopia. Tr. 506. Under "Plan" and next to "Treatment Lens," the provider wrote, "Bilateral: Refer to ophthalmologist for surgery. [E]duc[ate] [Jeannette] on how long wait list [sic] for [surgery] through Lions." Tr. 506. Next to "Spectacle Plan," the provider wrote, "Bilateral: Postponed spectacle Rx. Rx does not improve vision." Tr. 506.

In December 2014, Jeannette saw Martin Myers, M.D., for a consultative exam

---

[11]The examination report is in the record twice but the signatures of the doctors is different. *Compare* Tr. 506 *with* Tr. 538. The reports otherwise are the same.

in connection with her disability applications. Tr. 508–14. Under "History of Present Illness," he listed five problems (apparently based on her report to him): high blood pressure, cataracts, depression, anxiety, and low blood sugar. Tr. 508. Regarding cataracts, he wrote, "[Jeannette] reports that this began in 10/02/2014. [She] states that she currently suffers from not being able to see small letters. She says that she has been evaluated at an eye clinic. She states this affects her ability to work because she cannot read letters or see." Tr. 508.

In a review of systems, Jeannette told Dr. Myers she was experiencing weight loss, weight gain, night sweats, vision changes, nausea, vomiting, polyuria, difficulty with memory, and emotional problems. Tr. 509.

Based on a physical exam, Dr. Myers observed, "Pupils were equally round and reactive to light. Extraocular movements were intact. Visual acuity appeared grossly normal with intact visual fields by confrontation. Visual acuity on the left was 20/70 and on the right was 20/100. The patient had cataracts in both eyes, could not see the fundus due to cataracts." Tr. 509. He also examined Jeannette's head, ears, nose, throat, neck, cardiovascular system, lungs, abdomen, extremities, skin, neurological system, cranial nerves, cerebellar; muscles, nerves, reflexes, musculoskeletal system, and range of motion, with normal results in all areas. Tr. 509–14.

Under "Impressions," Dr. Myers listed hypertension, cataracts, anxiety, and low blood sugar. Tr. 511. About cataracts, he wrote,

> [Jeannette] states that she does not know what caused this and is concerned about the fact that she does not know what caused it. She says that in October she began to have loss of vision that came on fairly rapidly and has since resulted in significant problems with her vision. She has seen an eye clinic who reported that she has cataracts in both eyes. On examination today the funduscopic exam did reveal significant cataracts in both eyes and the cataracts were so prominent that I was unable to visualize the fundus past them. She states that she was only able to read the second line on the eye charts bilaterally and unable to read normal sized text on her forms including the forms that she had today for her appointment. Otherwise extraocular movements were

> intact. Visual fields seem to be intact as well. Overall my impression is that based on the examination she appears to have significant cataracts that are in fact very limiting in her ability to see. She would be unable to perform any activities that require reading even normal size fonts or any other activities that involve visual acuity.

Tr. 511.

In January 2015, after Dr. Matthews's referral to an ophthalmologist, Jeannette saw Juan Sanchez, M.D., P.A., who completed a "Visual Evaluation Report." Tr. 521–25. In a checklist under "Ophthalmic Review of Systems," he circled "Blurred" and "Glare" for both eyes. Tr. 521. He opined that Jeannette had best corrected vision in the right eye of 20/70 (far) and 20/20 (near), and in the left eye of 20/50 (far) and 20/50 (near). Tr. 521. In a "Slit Lamp Exam," he wrote that all areas of the eye were clear or within normal limits except for the lenses in both eyes, for which he wrote "Posterior subcapsular cataract." Tr. 521. In a "Fundus Exam," he wrote that her retinas were attached and all other areas were within normal limits. Tr. 522. He circled that, "Yes," the exam was consistent with visual field findings and that she had used her best effort during the examination. Tr. 522.

Next to "Summary and Impressions," he wrote "Posterior subcapsular cataract" followed by two illegible lines. Tr. 522. Under "Behavior Observations," he wrote, "worried about her eyes." Tr. 522. Under "Recommendations," he wrote, "Cataract Surgeries." Tr. 522.

In February 2016, state agency consultant Arthur Waldman, M.D., reviewed Jeannette's physical medical evidence at the reconsideration level. Tr. 87–88. He stated:

> Clt. has cataract[]s which allegedly impair vision. V/A (far) 20/70 OD, 20/50 OS[.] Field office[] noted that clt. could read printed documents, and V/A for Near is, in fact, better. While vision would likely be improved by cataract surgery, it does not constitute MDI for di[sa]bility

purposes. Nonsevere.[12]

Tr. 88.

The ALJ discussed Victoria's interaction with Jeannette and some allegations about visual problems:

> At the hearing, the claimant's mother testified that the claimant resided with friends most of the last few years before her death, although the claimant did reside with her for certain periods in the last few years of her life. According to the claimant's mother, she did not see or speak to the claimant often in the last few years of her life. The claimant's mother did [say] that she saw the claimant the day before her death. She also said that she would speak briefly to the claimant over the phone about once a week.

> The claimant's mother asserted that in the last two years of the claimant's life "she was going blind." According to the claimant's mother, in the last two years the claimant stopped driving. She also alleged that the claimant struggled to read in the last couple of years of her life.

> With respect to daily activities, the claimant's mother said that her boyfriend would assist [Jeannette] with household chores and cooking due to [Jeannette's] vision problems. According to the claimant's mother, [Jeannette] would struggle to see a person even across the room.

Tr. 21.

The ALJ discussed Jeannette's visual limitations:

> With respect to visual limitations, the claimant's mother testified about the claimant "going blind" in the last couple of years of her life. She described the claimant as unable to read, drive, or even recognize[] faces across the room. However, the record provides little evidence to support this allegation. Indeed, when Dr. Juan Sanchez examined the claimant on January 19, 2015, he found that she had 20/70 vision far and 20/20 vision near in her right eye; and 20/50 vision far and 20/50 vision near in her left eye. An earlier report on October 15, 2014, found 20/60 vision

---

[12]"An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a), 416.922(a).

in the claimant's left eye and 20/50 vision in the claimant's right eye. While this evidence indicates less than perfect vision, it is far from confirming that the claimant had gone blind. Moreover, the undersigned notes that the medical record indicated that cataract surgery was expected to almost fully address her vision problems, but she died before she could undergo this surgery (Exhibit 11F). To accommodate the degree of vision impairment suggested by these examinations, the undersigned finds the claimant was limited to no more than frequent reading of printed materials or reading of monitors.

Tr. 22-23 (other internal citations omitted).

The ALJ summarized parts of Dr. Myers's report, first stating:

When Dr. Martin Myers examined the claimant on December 27, 2014, he observed that her tandem waking was normal; and she was "able to lift, carry and handle light objects["] (Exhibit 2F/4). In all muscles evaluated of the upper and lower extremities, he noted that she retained "5" out of 5 muscle strength. He also found that she retains a normal range-of-motion throughout all joints and regions of the spine (Exhibit 2F/6–8).

Tr. 21.

The ALJ continued, summarizing Dr. Myers's findings on postural limitations: "[Dr. Myers] observed that she was able to squat and rise from that position with ease; rise from a sitting position without assistance; and she had no difficulty getting up and down from the exam table (Exhibit 2F/4). He also found that she retains a normal range-of-motion throughout all joints and regions of the spine (Exhibit 2F/6–8)." Tr. 22.

The ALJ also summarized Dr. Myers's findings on manipulative limitations:

[H]e noted that the claimant had a normal range-of-motion throughout the upper extremities; she had full muscle strength throughout all muscle groups of the upper extremities; and he noted that she was able to "perform fine motor skills such as opening doors, buttoning shirts, [and] manipulating a coin" (Exhibit 2F/4). In addition, he noted that she could dress and undress adequately well.

14

Tr. 22.

> The ALJ discussed the weight he was giving Dr. Myers's opinion:

> The undersigned assigns significant weight to the observations and findings contained in the physical consultative examination of Dr. Martin Myers from December 27, 2014 (Exhibit 2F). In the paragraphs above, the undersigned summarized and analyzed the observations and findings contained in this consultative examination report.

Tr. 23.

The ALJ likewise "assign[ed] significant weight to the observations and findings contained in the consultative examination report of Dr. Juan Sanchez from July 19, 2015 (Exhibit 4F)." Tr. 23.

The ALJ assigned little weight to the opinion of state agency consultant Dr. Waldman that Jeannette had no physical severe impairments; the ALJ instead found a severe impairment of post fracture of the fifth metatarsal "for the reasons explained" in the opinion.[13] Tr. 23.

Victoria observes that although the ALJ gave Dr. Myers's opinion significant weight, the ALJ never addressed the vision limitations discussed in Dr. Myers's opinion; Dr. Myers's vision limitations are inconsistent with the RFC; and the ALJ therefore failed to properly consider the opinion. Doc. 15 at 12–14.

Remand is warranted because the ALJ failed to state with particularity the weight he gave Dr. Myer's opinion about Jeannette's visual impairments and the reasons for the weight, *see Winschel*, 631 F.3d at 1179, and he failed to state the grounds for his decision with enough clarity to allow a court to conduct a meaningful

---

[13]The only statement in the decision regarding the metatarsal impairment is this: "The record mentions a past fracture of the fifth metatarsal, but this seems to have healed well within 12 months as it was mentioned in an encounter in June 2014, but not mentioned again after that encounter." Tr. 21 (and repeated at Tr. 22).

review, *see Owens*, 748 F.2d at 1516.

Jeannette claimed disability because of, among other impairments, vision problems that included cataracts and inability to read or drive. Tr. 52. The ALJ mentioned no visual impairment at step two despite addressing other impairments, both severe and non-severe. *See generally* Tr. 17–18. The ALJ failed to address the part of Dr. Myers's opinion about Jeannette's visual impairment. *See generally* Tr. 17–24. The ALJ stated he was giving "significant weight" to Dr. Myers's "observations and findings," Tr. 23, but the ALJ either disregarded or gave minimal weight to Dr. Myers's observations and findings about Jeannette's visual impairment. The only vision-related limitation in the RFC ("reading of printed materials and monitors was frequent, not constant," Tr. 20) is inconsistent with, and less restrictive than, Dr. Myers's observations and findings (Jeannette "appears to have significant cataracts that are in fact very limiting in her ability to see. She would be unable to perform any activities that require reading even normal size fonts or any other activities that involve visual acuity." Tr. 511). The ALJ stated "the medical record indicated that cataract surgery was expected to almost fully address [Jeannette's] vision problems, but she died before she could undergo this surgery (Exhibit 11F)," Tr. 22–23, but Exhibit 11F—a copy of Dr. Sanchez's examination recommending cataract surgery— does not support that statement.[14] While the ALJ may have had a reason for rejecting Dr. Myers's findings and observations about Jeannette's visual impairment. A reviewing court, however, cannot affirm merely because some unspecified rationale might support the ALJ's decision. *See Winschel* 631 F.3d at 1179.

The Commissioner observes that an ALJ need not "parrot" a medical opinion and need not refer to every piece of evidence so long as the ALJ clearly considers the claimant's medical condition as a whole. Doc. 21 at 6–7. Here, however, whether the

---

[14]To the extent the ALJ relied on Jeannette's failure to undergo cataract surgery, he made no findings on why she had not undergone the surgery. *See* Tr. 506 (note from Dr. Matthews's report in October 2014 referencing a long waitlist for surgery).

ALJ considered Jeannette's medical condition as a whole is unclear.

The Commissioner responds: "The other medical evidence of record also supports the ALJ's RFC assessment. In January 2015, Dr. Sanchez examined Claimant and found her with 20/70 vision far and 20/20 vision near in her right eye; and 20/50 vision far and 20/50 vision near in her left eye. Dr. Sanchez recommended cataract surgery. The ALJ assigned significant weight to Dr. Sanchez's opinion as well. Thus, substantial evidence supports the ALJ's decision to assign significant weight to Dr. Myers' opinion, which supports the ALJ's assessment of Plaintiff's RFC." Doc. 21 at 7 (internal citations omitted). The Commissioner's response is unclear considering that the ALJ gave significant weight to Dr. Myers's opinion, but Dr. Myers's findings and observations about Jeannette's visual impairment are inconsistent with the only visual limitation the ALJ included in the RFC.

Reversal and remand for re-evaluation of Dr. Myers's opinion about Jeannette's vision impairment is warranted.

**B.    *Jobs***

Victoria argues that substantial evidence does not support the ALJ's finding at step five that the jobs Jeannette could have performed exist in significant numbers in the national economy because the ALJ based the finding on the VE's testimony. According to Victoria, the VE overstated the job numbers. She also argues the ALJ failed to ask about, or reconcile, an asserted inconsistency between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). Doc. 15 at 14–25.

*1.    Overstatement*

The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show the claimant can perform jobs that exist in significant numbers in the national economy. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 n.10 (11th Cir. 2004). If

the Commissioner satisfies that burden, the burden shifts back to the claimant to show she cannot perform the jobs identified by the Commissioner. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

An ALJ may use a VE's testimony for the step-five finding. 20 C.F.R. §§ 404.1560(c)(2), 416.966(e); *Winschel*, 631 F.3d at 1180. A VE's testimony can be substantial evidence "even when unaccompanied by supporting data," but a reviewing court must "take[] into account all features of the [VE's] testimony, as well as the rest of the administrative record." *Biestek*, 139 S. Ct. at 1155, 1157.

The Social Security Administration "will take administrative notice of reliable job information available from various governmental publications," including the DOT, county business patterns and census reports published by the United States Census Bureau, occupational analyses prepared by state agencies, and the Occupational Outlook Handbook published by the Bureau of Labor Statistics. 20 C.F.R. §§ 404.1566(d)(1)–(5), 416.966(d)(1)–(5).

In *Goode v. Comm'r of Soc. Sec.*, No. 18-14771, 2020 WL 4333473, (11th Cir. July 28, 2020) (to be published), the Eleventh Circuit addressed the issue here. The court explained, "The Social Security Administration … does not tally the number of job openings at a given time, but rather approximates the number of positions that exist, whether vacant or filled, and without regard to the location of the work and a claimant's likelihood of being hired." *Id.* at *3 (internal quotations and citations omitted).

The court continued, "The DOT groups jobs into 'occupations' based on their similarities and assigns each occupation a code number." *Id.* The codes "do not provide statistical information about the number of jobs available in the national economy. Instead, the [VE] must look to other sources like the Occupational Employment Quarterly [], which is compiled by a private organization called U.S. Publishing, to find employment statistics. The [Occupational Employment Quarterly]

database, however, does not compile data by DOT codes, but rather through the Standard Occupational Classification [] system." [15] *Id.* "The [Standard Occupational Classification] system groups together detailed occupations with similar job duties. As a result, a single [Standard Occupational Classification] group may contain multiple DOT occupations." *Id.* To assist with the two sources, "the Bureau of Labor Statistics has published a crosswalk which provides the corresponding [Standard Occupational Classification] group code for each DOT occupation." *Id.*

The court held that the ALJ erred in relying on a VE's testimony because the VE "testified that there were 43,000 bakery worker jobs nationally and 1,000 regionally[,] [but the] numbers from [the Standard Occupational Classification group] are aggregate numbers for 65 separate DOT codes, and Ms. Goode was only capable of performing the job for only one of those DOT codes—that of bakery worker." *Id.* at *5 (internal citation omitted). The court held the VE must "take an additional step to approximate how many of those are the specific job or jobs that the claimant could perform." *Id.*

Acknowledging "various" ways a VE could use vocational "knowledge and expertise" to take that step, the Eleventh Circuit described two possible ways without opining on their merits: the equal distribution method, which divides the total number of jobs for a Standard Occupational Classification group by the number of

---

[15]The Bureau of Labor Statistics explains,

> The Standard Occupational Classification system is a federal statistical standard used by federal agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data. All workers are classified into one of 867 detailed occupations according to their occupational definition. To facilitate classification, detailed occupations are combined to form 459 broad occupations, 98 minor groups, and 23 major groups. Detailed occupations in the SOC with similar job duties, and in some cases skills, education, and/or training, are grouped together.

*Standard Occupational Classification*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/soc/ (last visited Aug. 13, 2020).

DOT occupations within that group (but the court cites a case criticizing the method as "illogical"), and the occupational density method, which uses a software program like JobBrowser Pro to interpret data. *Id*. at *6.

The court held that, on remand, the VE must "estimate the number of available jobs for bakery workers, and provide some explanation for how he arrived at that latter number," recognizing that the Social Security Act does not "mandate a precise count of job numbers" or require a VE to "formulate opinions with more confidence than imperfect data allows." *Id*. The court emphasized, "It is not [the court's] job or duty to speculate on what the [VE's] testimony would have been without the error." *Id*. at *5.

In a footnote, the court rejected the Commissioner's argument that the plaintiff's attorney had failed to properly question the VE during the administrative hearing, stating, "This is not a case in which the claimant failed to challenge or question the vocational expert's methodology or job numbers. *See Shaibi v. Berryhill*, 883 F.3d 1102, 1110 (9th Cir. 2017) (It is enough to raise the job numbers issue in a general sense before the ALJ. A claimant may do so by inquiring as to the evidentiary basis for a [VE's] estimated job numbers.)." *Id*. at n.3 (internal alterations omitted).

Here, at the administrative hearing, the ALJ asked the VE a hypothetical question that mirrored the RFC. Tr. 47. The VE responded, providing jobs Jeannette could have performed and stating how many of those jobs exist. Tr. 47–49. Victoria's counsel engaged the VE in this colloquy:

ATY  And then, in terms of your numbers, you're giving us the numbers for like the [Occupational Employment Statistics] classifications, like group of numbers as opposed to - -

VE  Yeah.

ATY  - - individual DOTs?

VE  Yes, it's a composite.

ATY   All right. All right. Nothing further then, Your Honor.

Tr. 49–50.

Based on the VE's testimony, the ALJ found Victoria could perform these jobs that exist in these numbers: hand packager, 1,173,500 in U.S.; cooks helper, 2,225,000 jobs in U.S.; advertising material distributor, 343,500 in U.S.; bench assembler (light), 648,000 jobs in U.S.; bench assembler (sedentary), 265,000 jobs in U.S.; and hand packager, 248,000 jobs in U.S. Tr. 25.

Victoria makes an argument like the successful argument in *Goode*. She argues the VE relied on numbers for groups of occupations under Occupational Employment Statistics classifications without narrowing them to the DOT codes for each job the VE opined Jeanette could have performed, and the VE testified about numbers that are higher than the numbers in the Occupational Employment Statistics. Doc. 15 at 14–18.

The Occupational Employment Statistics is a program through the U.S. Bureau of Labor Statistics that uses a semi-annual survey to "produce employment and wage estimates for about 800 occupations," and the U.S. Bureau of Labor Statistics "produces occupational employment and wage estimates for approximately 415 industry classifications at the national level." *Occupational Employment Statistics*, Overview, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/oes/oes_emp.htm# (last visited Aug. 13, 2020). Victoria cites documentation she provided to the Appeals Council below showing that, for example, the "Packers and Packagers, Hand" Occupational Employment Statistics group includes 59 different DOT codes. Tr. 427.

Applying *Goode*, remand is warranted because the VE failed to take the additional step of testifying about approximately how many jobs in the Occupational Employment Statistics were the specific jobs the VE opined the hypothetical person could perform. Without more, substantial evidence does not support the ALJ's step-

five finding on job numbers.

Having filed his brief before *Goode*, the Commissioner cites district court opinions for the proposition that any overinflated job numbers may be harmless if a reduced number would still constitute a significant number of jobs. Doc. 21 at 17. Finding that a reduced number would still constitute a significant number of jobs is unwarranted considering the court's statement in *Goode* it is not the court's "job or duty to speculate on what the [VE's] testimony would have been without the error." *Goode*, 2020 WL 4333473 at \*5.

The Commissioner compares Victoria's argument to an argument made in *Webster v. v. Commissioner of Social Security,* 773 F. App'x 553, 555–56 (11th Cir. 2019). Doc. 21 at 13–14. In *Webster*, the Eleventh Circuit rejected the plaintiff's argument that job numbers based on a Standard Occupational Classification group showed the VE's testimony was unreliable because the plaintiff had not questioned the VE's qualifications, the questions the plaintiff had posed to the VE did not address concerns about reliability of the VE's testimony, and the VE's testimony showed the VE had relied on the DOT and his own experience of surveying employers. *Id.*

Here, the Commissioner observes Victoria did not question the VE's qualifications, did not ask the VE for supporting data related to job numbers, and did not present evidence at the hearing to contradict the job numbers. Doc. 21 at 14. According to the Commissioner, "Similar to *Webster*, this court should find unavailing Plaintiff's argument about the VE's testimony and [Standard Occupational Classification] codes; and instead, find that the VE's testimony constitutes substantial evidence[.]" Doc. 21 at 14.

To the extent the Commissioner argues Victoria failed to sufficiently raise concerns about the job numbers during the administrative hearing, the argument is unpersuasive. As in *Goode*, Victoria's counsel asked the VE the basis for the job numbers (the Occupational Employment Statistics) and now argues based on that

22

record the VE's testimony does not amount to substantial evidence to support the ALJ's findings on job numbers because the VE failed to narrow the Occupational Employment Statistics numbers to match the DOT codes.

Reversal and remand for re-evaluation of the job numbers is warranted.

2.    *Conflict*

Social Security Ruling ("SSR") 004-p explains,

When there is an apparent unresolved conflict between VE or [vocational specialist ("VS")] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence. … As part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

…

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that … evidence and information provided in the DOT. In these situations, the adjudicator will: [a]sk the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and if the … evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704 at *2, 4.[16]

In *Washington v. Commissioner of Social Security*, the Eleventh Circuit held that an ALJ has an affirmative duty to (1) identify any apparent conflict between a

---

[16]SSRs are agency rulings published under the Commissioner's authority and binding on all components of the Social Security Administration. *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990). They are not binding on a court but may be entitled to great respect and deference. *B.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. Unit B. 1981); *see Stein v. Reynolds Sec. Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (Eleventh Circuit is bound by decisions issued by Unit B panels of the former Fifth Circuit).

VE's testimony and the DOT, (2) ask the VE about the conflict, and (3) explain in the decision resolution of the conflict. 906 F.3d 1353, 1365 (11th Cir. 2018). A conflict is apparent if a reasonable comparison of a VE's testimony with the DOT suggests a discrepancy, even if further investigation shows no discrepancy. *Id.* The ALJ must "follow the procedure laid out in SSR 00-4p." *Id.* at 1361.

The DOT assigns jobs a reasoning level, with one the lowest and six the highest. DOT, App'x C, 1991 WL 688702 (4th ed. rev'd 1991). Level one requires an employee to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.* Level two requires an employee to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* Level three requires an employee to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." *Id.*

Before *Washington*, the Eleventh Circuit observed reasoning levels of two or three may be jobs with simple tasks. *See, e.g.*, *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869, 873 (11th Cir. 2016). After *Washington*, the Eleventh Circuit, in an unpublished opinion, held that an RFC of "simple, routine, and repetitive tasks" is not inconsistent with a job with a reasoning level of two. *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1009 (11th Cir. 2020) (citing the ALJ's duty under *Washington* to affirmatively identify and resolve apparent conflicts between the VE's testimony and DOT but not using the "apparent conflict" language in its holding, instead saying the two were "not inconsistent").

Here, at the hearing, the ALJ did not ask the VE if the VE's testimony is consistent with the DOT. In the decision, the ALJ stated, "Pursuant to SSR 004-p, the undersigned has determined that the [VE's] testimony is consistent with the

24

information contained in the [DOT]." Tr. 25.

Victoria argues the ALJ erred by failing to ask the VE if the testimony was consistent with the DOT and failing to resolve an apparent conflict between the limitation to simple and repetitive tasks and jobs with a reasoning level of two. Doc. 15 at 18–23. Victoria observes four jobs—hand packager, cooks helper, and bench assembler (two versions)—have a reasoning level of two. Doc. 15 at 21. She contends any error is not harmless because, even though another job the ALJ identified has a reasoning level of one (advertising material distributor) the job numbers for that position, as argued, may be overinflated. Doc. 15 at 22–23.

Victoria's argument is unpersuasive. As the Eleventh Circuit has observed, a limitation to simple tasks is not inconsistent with, and does not create a discrepancy showing an apparent conflict with, reasoning level two (i.e., applying "commonsense understanding to carry out detailed but uninvolved written or oral instructions" and dealing "with problems involving a few concrete variables in or from standardized situations").

Reversal and remand for re-evaluation of the asserted inconsistency is not warranted.

## C.   *Limitation in Concentrating, Persisting, or Maintaining Pace*

Victoria argues the ALJ failed to account in the RFC for Jeannette's moderate limitation in concentrating, persisting, or maintaining pace. Doc. 15 at 7–11. She observes the ALJ described how he would account for a moderate limitation in other "paragraph B" areas but not in the area of concentrating, persisting, or maintaining pace. Doc. 15 at 8–9. She argues the ALJ should have included a limitation in this area in the hypothetical question to the VE. Doc. 15 at 9–11.

For a VE's testimony to amount to substantial evidence, the ALJ must ask the VE a hypothetical question that includes or implicitly accounts for the claimant's

impairments. *Samuels v. Acting Comm'r of Soc. Sec.*, 959 F.3d 1042, 1047 (11th Cir. 2020). But the ALJ need not include findings the ALJ properly rejected as unsupported. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

In *Winschel*, the Eleventh Circuit held that, for a VE's testimony to amount to substantial evidence, the ALJ must ask the VE a hypothetical question that includes, or implicitly accounts for, a moderate limitation in concentrating, persisting, or maintaining pace. 631 F.3d at 1180–81.

Later applying *Winschel* in *Timmons v. Commissioner of Social Security*, the Eleventh Circuit held that restricting a claimant to simple and routine tasks adequately accounts for a moderate limitation in concentrating, persisting, or maintaining pace if the evidence shows the claimant can perform those tasks even with the limitation. 522 F. App'x 897, 907 (11th Cir. 2013); *see, e.g., Mijenes v. Comm'r of Soc. Sec.*, 687 F. App'x 842, 846 (11th Cir. 2017) ("Because the medical evidence [including an ability to perform most household responsibilities and mental status exams with fair insight and judgment and normal thought processes] showed that Mijenes could perform simple, routine tasks despite her [moderate] limitations in concentration, persistence, and pace, the ALJ's limiting of Mijenes's [RFC] to unskilled work sufficiently accounted for her moderate difficulties in concentration, persistence, and pace.").

During the December 2014 exam with Dr. Myers, Jeannette reported having depression or anxiety, and Dr. Myers noted, "She states this affects her ability to work because she doesn't want to get out of bed and doesn't want to be around people." Tr. 508. The neurologic portion of the exam shows Jeannette had normal memory and good concentration. Tr. 510. Under "Impressions," Dr. Myers wrote, "Anxiety" and "Overall if there are any limitations due to this particular diagnosis this was not seen on examination today." Tr. 511.

Jeannette underwent a consultative psychological evaluation with Maria

Jimenez, Psy. D., in December 2014. Tr. 516–19. Under "General Observations," Dr. Jimenez stated that Jeannette had arrived with a friend and had reported that she took the bus to get to the appointment; she had been able to answer all questions but had had some difficulties with specific information and dates; and she had mildly smelled of alcohol. Tr. 516. In a subjective explanation of symptoms, Jeannette reported that she was depressed; had decreased concentration and a lack of motivation; could perform household chores if she had the energy; and could manage finances and pay the bills timely if she had the funds. Tr. 517. Dr. Jimenez observed Jeannette's "affect appeared restricted." Tr. 517. At the bottom of the subjective explanation of symptoms, Dr. Jimenez wrote, "The current level of mental health symptoms would best be characterized as moderate/severe." Tr. 517. (Whether that was Jeannette's statement or Dr. Jimenez's statement based on Jeannette's description of symptoms is unclear.)

In a mental status evaluation, Jeannette was alert and oriented to person, place, situation, and time; demonstrated adequate attention and concentration; had fair mental flexibility (could spell "world" backward on the second try); had no significant difficulties in processing speed; had adequate receptive language by completing all verbal commands and written tasks without error; had adequate immediate memory; had moderately impaired recent memory (able to recall one of three words after a short delay); had fair remote memory; and good mental computation. Tr. 518. She also had fair social skills; fair judgment; appropriate insight; below average intelligence; coherent, logical, and goal directed thought processes; appropriate thought form and content. Tr. 518. She denied suicidal or homicidal ideations or experiencing hallucinations. Tr. 518.

Dr. Jimenez diagnosed alcohol use disorder (severe), adjustment disorder with anxiety, and major depressive disorder (recurrent episode, moderate). Tr. 518.

Under "Summary," Dr. Jimenez stated: "The overall presentation appeared valid and consistent with the reported conditions. The mental health symptoms based

on report and clinical observations appear to be moderately to severely impacting activities of daily living, vocational performance, and interpersonal interactions. Current prognosis for Ms. Langer is considered guarded. With regards to financial management, Ms. Langer is not recommended to manage benefits and financial decisions." Tr. 519.

In December 2015, Jeannette visited Baycare Behavioral Health for a biopsychosocial assessment. Tr. 531–35. Based on an exam, the provider—using a checklist—marked "poor" concentration; an abnormal sleep pattern; calm, depressed, and irritable mood; neutral affect; normal speech; average eye contact; no abnormal thought processes; oriented to person, place, time, and situation; normal motor activities; no delusions, hallucinations, ideas of reference, compulsions, or phobias; average cognitive or intellectual functioning; appropriate judgment; good insight; alert responsiveness; a cooperative attitude; and good motivation for treatment. Tr. 534.

In a summary, the provider wrote, "[Jeannette] would like to get help to stabilize her moods and regain positive thinking. Therapy sessions will help her identify her stressors, help her increase self esteem and self confidence and help her learn better coping skills to decrease depression and anxiety. [Jeannette] is appropriate for services and has good prognosis if she complies with treatment." Tr. 535.

State-agency consultants at the initial and reconsideration level found Jeannette would have moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace. Tr. 58, 89.

The ALJ stated:

The claimant's mother testified that the claimant had a history of fairly significant alcohol consumption on a daily basis. She said she was not aware if the claimant would regularly receive any mental health treatment. About half the time that she spoke to her on the phone, the

claimant's mother said that the claimant would seem to be intoxicated.

Tr. 21.

On the state-agency consultants' opinions on mental limitations, the ALJ stated:

> As for the opinion evidence pertaining to the claimant's mental [RFC], the undersigned gives significant weight to the opinion of Dr. Maurice Rudmann from February 11, 2016 (Exhibit 7A, 8A). The undersigned agrees with his view that the claimant "may have a difficult time adjusting to extreme changes" yet "appears capable of "[sic] adapting to basic, routine changes in a workplace setting"; and "demonstrated adequate social skills" when she was "motivated and sober."
>
> The undersigned also gives significant weight to the opinion of Dr. Lauriann Sandrik from December 31, 2015 (Exhibit 1A, 2A). The undersigned agrees with her view that the claimant "may have a difficult time adjusting to extreme changes" yet "appears capable of " [sic] adapting to basic, routine changes in a workplace setting"; and "demonstrated adequate social skills" when she was "motivated and sober."

Tr. 23. The ALJ gave significant weight to the observations and findings in Dr. Jimenez's report. Tr. 23.

Remand for the ALJ to account for Jeannette's moderate limitation in concentrating, persisting, or maintaining pace in the RFC is unwarranted. The ALJ implicitly accounted for the limitation in the RFC because substantial evidence supports that Jeannette could perform "simple and repetitive tasks" with a gradual introduction to changes in the work routine, Tr. 20, despite a moderate limitation in concentrating, persisting, or maintaining pace.

The evidence on mental limitations—summarized above—is sparse, with one appointment at a behavioral center and two reports from consultative exams (with one primarily physical). Although the provider at the behavioral center marked "poor" concentration (based on a self-report or an objective finding), Jeannette otherwise

had mainly normal results with a good prognosis for treatment. The exam with Dr. Myers (mainly physical) resulted in no observable limitations from anxiety. Jeannette had adequate concentration and otherwise normal results in the consultative mental exam with Dr. Jimenez. That evidence supports that, despite any limitation, Jeannette could perform unskilled jobs involving simple and repetitive tasks with any gradually introduced changes. Because the RFC accounted for Jeannette's moderate limitation in concentration, persistence, and pace, the ALJ did not have to include any further limitation relating to that area in the hypothetical question to the VE.

Victoria argues the limitation to simple, repetitive work "does not necessarily account for the moderate limitation in concentration, persistence, and pace," citing cases from the Fourth Circuit, a Michigan district court, and a Georgia district court. Doc. 15 at 9–10. Those cases are unpersuasive given the binding precedent (*Winschel*) and other cases cited here.

Victoria argues the limitation to not climbing ladders "due to distractibility" does not account for Jeannette's moderate limitation in concentrating, persisting, or maintaining pace, particularly because the degree of distractibility is not defined and the VE testified being "off task" for more than fifteen percent of the day would preclude work. Doc. 15 at 10. This argument also is unpersuasive because the limitation to simple and repetitive tasks without more adequately accounts for the limitation here in concentrating, persisting, and maintaining pace.

Reversal and remand to re-evaluate Jeannette's moderate limitation in concentrating, persisting, or maintaining pace and related limitations is   not warranted.

## V.    Remand

In one sentence in the concluding paragraph, Victoria asks the Court to remand the case to the Social Security Administration "for an award of benefits."

Remand is appropriate "where the ALJ has failed to apply the correct legal standards." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). A court may, however, reverse for an outright award of benefits if the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Id*. Remand for reconsideration— not an award of benefits—is appropriate here because Victoria has not established Jeannette's disability without a doubt.

Victoria also asks the Court to include in any final judgment language about the timeliness of a motion for fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, based on a standing order regarding fees (citing 6:12-mc-124-Orl-22 and attaching the order as an exhibit to the brief, Doc. 15-1). Doc. 15 at 24. Because the order is a standing order governing this Court, inclusion of that language in a final judgment is unnecessary.

## VI.   Recommendation[17]

The undersigned recommends:

(1)   reversing the Commissioner's decision under sentence four of 42 U.S.C. § 405(g);

(2)   remanding the case with directions to (a) re-evaluate Jeanette's visual impairment and Dr. Myers's observations and findings about her visual impairment; (b) re-evaluate the job numbers as necessary; and (c) take any other necessary action; and

---

[17]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive matter], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id*. A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

(3)     directing the Clerk of Court to: (a) enter judgment for Victoria
        Langer and against the Commissioner of Social Security under
        sentence four of 42 U.S.C. § 405(g); and (b) close the file.

**Entered** in Jacksonville, Florida, on August 14, 2020.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     The Honorable Susan C. Bucklew
       Counsel of Record